UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                            Chapter 11
City Wide Investments, LLC,                                      Case No. 17-22900-svk
                Debtor.

City Wide Investments, LLC,
                Plaintiff,
v.                                                               Adversary No. 17-02115

City of Milwaukee,
                Defendant.

## MEMORANDUM DECISION

### Background and Facts

On April 26, 2017, the Chapter 11 Debtor filed an adversary complaint against the City of Milwaukee (the "City"). The complaint asserts that the City's taking of an eight-unit rental property through in rem tax foreclosure was a fraudulent transfer. The Court held a trial on September 19, 2017. Leonard G. Leverson appeared for the Debtor and Kevin P. Sullivan and Hannah R. Jahn appeared for the City. There is no dispute that the Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer, and the transfer took place less than two years before the petition date. *See* 11 U.S.C. § 548(a)(1)(B). Thus, the question is whether the Debtor received reasonably equivalent value for the transfer.

At the time of the transfer, the Debtor owed the City $49,105.44. (*Stipulation of Facts*, Docket No. 14.) According to the testimony of John Nazario, the Debtor's sole member, the Debtor had paid the base real estate taxes, and most of the amount due to the City was for building code violations and other fines added to the tax bill. The Debtor attempted to save the

property from the tax foreclosure but these efforts were unsuccessful due to miscommunications with the Debtor's bank.  The City took title to the property on January 4, 2016 and sold the property for $150,000 on March 17, 2017.  In the complaint, the Debtor sought to recover the value of the property from the City, less the consideration received in the amount of the unpaid fines and fees.

Mr. Nazario testified that in December 2013, a tenant damaged two electrical boxes, rendering the property unsafe.  The City required all the tenants to leave the property, and the building was "placarded" and boarded up.  Mr. Nazario represented that the problem was repaired by February 2014, but the tenants were not permitted to return until all of the building code violations were corrected.  The property remained vacant and placarded until the City took title, and vandalism occurred.

However, by January 4, 2016 when the City completed the tax foreclosure, Mr. Nazario said that substantial repairs had been performed.  Four of the units in the building were ready to rent and three of the units were ready except for the installation of carpeting.  The eighth unit had been deconstructed and was being rebuilt, but the materials had been purchased.  Mr. Nazario estimated that the cost to make the building fully rentable was about $6,700.  He disagreed with a $43,040 estimate prepared by the City on a "Scope of Work."  Mr. Nazario analyzed almost every line item on the Scope of Work and refuted the estimates.  Neil Bliese, a contractor who had performed work for the Debtor, testified that it would have cost $5,000 to eliminate code violations and make the property rental-ready.

Steven Stiloski, the Debtor's appraiser, opined that the fee simple market value of the property at the time of the transfer was $340,000. Mr. Stiloski performed what he termed a retrospective appraisal, looking only at comparable sales completed around the time of the

2

transfer. In arriving at his opinion, Mr. Stiloski assumed the property was in the same condition as the date he visited the property and subtracted $10,000 to account for the deferred maintenance described by Mr. Nazario. He employed both sales comparison and income capitalization approaches. For his income capitalization approach, he did a survey of rents in the area for similar units and came up with a monthly rent of $625, including $50 for garage space. He then deducted operating expenses, a replacement reserve, and typical vacancy rates. Applying two capitalization rates, 10.25% and 10.75%, he arrived at a value range between $340,000 and $360,000. Starting with a $350,000 value, he subtracted the deferred maintenance costs and arrived at a value of $340,000. In his sales comparison analysis, Mr. Stiloski reviewed four sales in the property's general location, and after adjustments, arrived at a value of $340,000 for the property, again accounting for $10,000 in deferred maintenance.

Dwayne Edwards, a real estate specialist for the Department of City Development, testified about the process the City followed in selling the property. He visited the property in March of 2016 and took photographs of its condition. He said it was in the best condition of the properties in his portfolio of City-owned properties. In May, a Department of Neighborhood Services inspector visited the property and prepared the Scope of Work. Then in June, Mr. Edwards's department prepared a listing sheet to market the property and provided the listing sheet to the alderwoman for her approval. Mr. Edwards testified that his department does not begin marketing a property until an alderperson has agreed to support the sale and a particular proposal because any proposal must go before the Common Council. Thus, the City did not start marketing the property until a buyer was lined up. The eventual buyer contacted Mr. Edwards's department in late October 2016 after learning about the property from a City inspector. Mr. Edwards advised the potential buyer that the property was not ready to market because the

3

Case 17-02115-svk    Doc 17    Filed 10/03/17    Page 3 of 6

department had not yet received support from the alderwoman. He encouraged the buyer to sign up to receive a notification when the property was listed on the City's website. Later in October, the alderwoman agreed to sponsor the sale.

In December, the property was listed for $175,000 on the City's website, and the eventual buyer submitted a proposal to purchase the property for $150,000. Mr. Edwards testified that his department usually arrived at a listing price after looking at recent market data. He stated the assessed value of the property was a little more than $200,000, and his staff determined to reduce that based on the Scope of Work. Mr. Edwards did not know if anyone in his department was aware that around the same time the City was listing the property, a similar building on the same street was listed for $399,000 and sold quickly for $410,000.

The property was not listed on MLS, Craigslist, or LoopNet, and the City did not erect a for sale sign, although it did list the property on social media, the alderwoman's newsletter and the City's website. Mr. Edwards testified that after the alderwoman agreed to sponsor the sale, he would tell any interested parties that a proposal was pending. According to Mr. Edwards, the department would not have considered a competing offer. After further review of the purchase proposal, the sale was approved by the Common Council, the mayor signed off, and the sale for $150,000 closed on March 17, 2017. Mr. Edwards acknowledged that his department and the Common Council take into account non-monetary factors including whether the buyer is a responsible buyer, job creation, and the impact of a project on the neighborhood when seeking to sell a property, and thus achieving the highest and best price was not the City's only objective.

Mr. Leverson argued that the City's process is not designed to maximize value, and Mr. Sullivan did not dispute that the process put the City at risk for a fraudulent transfer claim. However, Mr. Sullivan argued that given the condition of the property, the Debtor received a

4

reasonably equivalent value for the transfer. The Court disagreed, as the property was clearly worth more than the $49,105.44 in taxes and fines that the parties stipulated accounted for the total consideration the Debtor received for the transfer. (*See Stipulation of Facts*, Docket No. 14.) After the trial, the Court took the question of the value of the transfer under advisement and now issues this decision.

Discussion

Pursuant to 11 U.S.C. § 550(a), to the extent that a transfer is avoidable as a fraudulent transfer under § 548, a debtor may recover the property transferred or "the value of such property." Here, the Debtor seeks to recover the value of the property, since the City has sold the property to a good faith purchaser who could assert a defense barring recovery of the property itself. Section 550(a) does not define "value," but courts agree that the relevant value is the fair market value at the time the property was transferred. *See Gennrich v. Montana Sport U.S.A., Ltd. (In re International Ski Serv., Inc.)*, 119 B.R. 654, 658-59 (Bankr. W.D. Wis. 1990).

The March 2016 photographs of the building introduced by the City were consistent with Mr. Nazario's testimony and showed that the building required only modest repairs and finishing work. Mr. Stiloski was a credible witness, and although the comparable properties he used in his analysis were not boarded up, and he did not review open building code violations, he took the deferred maintenance into account. He also testified that the rental market was strong and the fact that the property was not occupied at the time of the transfer would not have had a significant negative impact on its value.

Mr. Stiloski testified that he requested information from the City as to whether there were any open code violations but did not receive a response. Mr. Edwards testified that the Scope of Work represented a ballpark estimate of the cost of the minimum renovations required for

5

building code compliance. The document itself stated it is the "minimum requirement to meet health and safety issues." (Docket No. 12 at 23) (emphasis omitted). The Scope of Work stated the total interior and exterior cost was $43,040. But Mr. Nazario was able to question and rebut many of the items on the Scope of Work, and Mr. Edwards was not able to respond to this testimony, since a City employee in another department prepared the document. For example, among other ambiguously described repairs, it contained entries for $2,550 in "miscellaneous" electrical repairs. Mr. Nazario testified that he did not know what electrical repairs were required. The relevant units had power, and he had not initiated any electrical repairs.

Based on the testimony, the Court cannot accept the City's Scope of Work in determining the cost of repairs required to render the property rentable. Subtracting the questionable entries, and crediting the testimony of Messrs. Nazario and Bliese, the Court determines that the approximate cost to bring the property into rentable condition was $20,000. Because Mr. Stiloski's appraisal already deducted $10,000 to account for deferred maintenance, the Court will deduct another $10,000 from his $340,000 opinion of value. Accordingly, the Court determines the fair market value of the property at the time of the transfer was $330,000. Subtracting the consideration the Debtor received, which the parties agreed was $49,105.44, the City received a constructively fraudulent transfer in the amount of $280,894.56. Judgment on the Debtor's claim will be entered accordingly.

Dated: October 3, 2017

                                                  By the Court:

                                                  _/s/ Susan Kelley_
                                                  Susan V. Kelley
                                                  Chief U.S. Bankruptcy Judge